UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Stanley Fort, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 15 CV 50189 |
| | ) Magistrate Judge Iain D. Johnston |
| Carolyn W. Colvin, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Stanley Fort brings this action under 42 U.S.C. §405(g), challenging one part of the Administrative Law Judge's ("ALJ") decision. The ALJ found that plaintiff was disabled as of March 13, 2013, and therefore should be awarded supplemental security income from this date forward. That decision is not being challenged here. Plaintiff filed this appeal because he believes the ALJ also should have found him disabled at least several months earlier (*i.e.* sometime before his date last insured of December 31, 2012), which would mean that he would also qualify for disability insurance benefits, resulting in a higher monthly payment.[1]

## BACKGROUND

On March 26, 2012, plaintiff protectively filed a Title II application for disability insurance benefits and Title XVI application for supplemental security income. He alleged an onset date of June 30, 2007, almost five years earlier. This was around the time he supposedly stopped working as busboy and dishwasher at a barbeque restaurant (more on this topic below).

---

[1] Plaintiff explains the difference as follows: "The difference between SSI and SSDI in Mr. Fort's case according to 2012 numbers, the last time his PIA was calculated in the file, is approximately an additional $458.00 monthly and access to Medicare." Dkt. #12 at 2, n.1.

1

R. 69. Plaintiff alleged disability as a result of diabetes, hypertension, arthritis, and right shoulder pain. R. 60.

Plaintiff first sought treatment for these conditions a month before he filed his applications. On February 27, 2012, he went to the emergency room asserting as his chief complaint that he had "[m]outh discomfort and inability to taste food." R. 253. According to the notes from this visit, plaintiff, who was then 51 years old, had "never seen a doctor that he can remember." *Id.* Doctors concluded that his mouth and tongue discomfort were secondary to newly diagnosed and uncontrolled diabetes, and they diagnosed him with hypertension. He was treated for these problems and released a few days later. This would be his only hospital stay.

He then established primary care treatment with Crusader Clinic. In a May 2012 visit, he reported improvement with his diabetic symptoms. In a July 2012 visit, he reported having a pain in his right shoulder that was keeping him up at night.

On November 28, 2012, plaintiff was examined by consultative examiner Dr. Ramchandani. Plaintiff complained about an aching pain in his right shoulder and left knee, as well as blurred vision. However, he denied having any hip pain. R. 319. Dr. Ramchandani noted that plaintiff had a normal, unassisted gait and was able to walk on his heels and toes, but was unable to squat due to pain in his left knee. An x-ray was ordered, which showed moderate arthritic changes to plaintiff's left hip. R. 322.

Throughout 2013, plaintiff saw healthcare providers at Crusader Clinic on various occasions and reported (among other things) knee pain, swelling, and diabetic problems.

On February 6, 2014, a hearing was held before the ALJ. Plaintiff, who was represented by counsel, testified about his education, work history, and medical problems. He stated that he has a sharp pain in his leg that hurts "all the time," that his side and shoulder also hurt "all the

2

time," that he has "cramps real bad" in both knees, and that his hip bothered him "every now and then." R. 41-42. He stated that the hip pain was on his right hip. On a typical day, he would "just sit there, watch tv." R. 44. When the ALJ asked him whether he cooked any meals, plaintiff replied as follows: "Oh, no. No. No, I don't." R. 44. He later added that he relied on his girlfriend, who is disabled, to do the cooking (as well as household chores) because plaintiff "can't cook." R. 45.

The above testimony was elicited by the ALJ. Plaintiff's attorney then asked additional questions. Plaintiff testified that he could stand for maybe 20 minutes at a time and that he had to lean on things and had fallen "a couple times." R. 46. He used the cane only for walking because he could lean on something while standing. He could walk for about a half a block, using a cane, before he had to sit down. Plaintiff stated that he always used his cane when he left his house.

On February 28, 2014, the ALJ found that plaintiff was disabled as of March 13, 2013. The ALJ found that plaintiff had the following severe impairments: "insulin dependent diabetes mellitus; osteoarthritis of the left hip, left knee, and right shoulder; hypertension with tobacco abuse; limited far acuity; and obesity." R. 15. The ALJ concluded that, before March 13, 2013, plaintiff had the residual functional capacity to do light work. In reaching this conclusion, the ALJ found that there were a "number of inconsistencies" relevant to plaintiff's credibility. R. 18.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S.

3

389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).

In this appeal, plaintiff raises one broader argument and several discrete ones. The "overarching question" in this case, according to plaintiff, is whether the ALJ inconsistently found plaintiff disabled as of March 13, 2013, but not earlier. The lurking issue is whether plaintiff's condition progressively worsened, which the ALJ's ruling assumes, or whether it remained essentially the same, which seems to be plaintiff's position.

Plaintiff makes two specific arguments regarding this issue. He argues that the ALJ "did not articulate any rationale" for choosing this particular onset date, and that the ALJ also failed to "elicit" testimony on this issue. Dkt. #20 at 1. The Court is not persuaded by the first argument because the ALJ pointed to specific reasons for choosing the onset date. The ALJ noted, for example, that plaintiff himself indicated that his condition had recently worsened (as of January 2013) because he had been shot while being robbed; that plaintiff described his problems to doctors as being more intense in some visits after March 13th; that plaintiff's weight had increased, thus putting more strain on his joints; that plaintiff's doctor in October 2013 had

4

prescribed Tramadol for pain (to replace the Tylenol plaintiff had been using); and that plaintiff had been referred to a podiatrist in March 2013. R. 21-22, 231. Plaintiff's argument mostly ignores this evidence. In the few places where he offered a counter-argument to these points, plaintiff did so by implicitly conceding that the evidence is mixed such that the ALJ's interpretation would be a reasonable one. *See, e.g.,* Dkt. #12 at 8 (arguing that it "does not seem a *huge stretch* to find" that he was disabled two and a half months earlier) (emphasis added). As the Government points out, it is plaintiff's burden to prove that he was disabled. *See Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008) (the claimant "bears the burden of producing medical evidence" and "bears the risk of uncertainty" when the record is sparse).

Plaintiff's other argument—that the ALJ failed to elicit testimony on this issue—is also unpersuasive. Here is how plaintiff frames the argument in his opening brief: "The ALJ did not *specifically elicit* testimony from Mr. Fort indicating whether his pain had progressed since 2007[;] however the transcript *would seem to indicate* that Mr. Fort did not testify to any difference in his pain from 2007 to 2013." Dkt. #12 at 6 (emphasis added). This argument is unconvincing. As an initial point, it overlooks the fact that plaintiff was represented at the hearing by counsel who was allowed to—and, in fact, did—ask questions about evidence plaintiff believed was favorable. The argument also again ignores the non-testimonial evidence relied on by the ALJ, including statements plaintiff made to his doctors. *See, e.g.* R. 231. Moreover, although plaintiff originally identified his onset date as being in 2007, he now seems to focus on the latter half of 2012 as the period when he became disabled. He does not make any strong argument for the original 2007 date. For example, in a post-hearing brief to the Appeals Council, plaintiff's counsel stated that plaintiff was disabled "as early as July 2012," seemingly abandoning the original 2007 date. R. 250. So, even under plaintiff's theory, there is a line-

5

drawing question of determining exactly when his symptoms crossed the disability threshold. Finally, plaintiff's onset-inconsistency argument fails to consider that, rather than finding plaintiff was disabled at an *earlier* date, the ALJ alternatively could have resolved the contradiction by finding that he was not disabled at all. For reasons that will be discussed at the end of this opinion, such a conclusion was arguably more justified.

The Court next turns to plaintiff's three discrete arguments, all of which loosely fall under the issue of plaintiff's credibility. The Court is not persuaded that these arguments, either individually or collectively, justify a remand.

First, plaintiff complains that the ALJ unfairly cherry-picked the evidence relating to his daily activities. The ALJ described and analyzed these activities in two paragraphs, relying on plaintiff's hearing testimony and self-reports from 2012 and early 2013. R. 18. The Court does not find that the ALJ presented a one-sided version or omitted any important facts. Plaintiff argues that the ALJ "did not mention" that he needed "frequent breaks in doing limited household chores." Dkt. #12 at 6. But the ALJ acknowledged this point by noting that plaintiff reported that he "*has trouble* completing chores and relies on others to assist him with house and yard work." R. 18 (emphasis added). Similarly, plaintiff claims the ALJ ignored that he claimed that he "[p]rimarily" spent the day watching television or sitting on the porch. Dkt. #12 at 6. However, the ALJ also acknowledged this fact, stating that plaintiff reported that he "spends the *majority* of his time laying around watching television, listening to music, or sitting on his porch." R. 18 (emphasis added). Another daily activity issue is the ALJ's reference to plaintiff rebuilding bikes. Plaintiff argues that rebuilding bikes was merely listed by him as a hobby or interest on a Function Report but that he "did not state that he was actually engaging in that activity." Dkt. #20 at 2. On the form, plaintiff answered two questions. The first asked about

"your hobbies and interests," to which plaintiff responded that he "like[d] to rebuild old bikes, watching movies." R. 179. The follow-up question asked "[h]ow often and how well do you do these things," to which plaintiff answered as follows: "I do not build bikes *as much*, but I watch TV a lot." *Id.* (emphasis added). The ALJ's opinion reflects the general tenor of these answers. The ALJ merely stated that plaintiff had reported that he "was still doing occasional yard work and reported that he *enjoyed* riding and rebuilding old bicycles." R. 18 (emphasis added). When read fairly in context, the Court finds that this description is a reasonable interpretation of the source document. It is always possible to argue over slight differences in the way daily activities are paraphrased or summarized based on multiple source documents, but these differences are not a basis for a remand. As the Government notes, this Court must uphold the ALJ's decision even where there is room for reasonable disagreement. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

Second, plaintiff complains that the ALJ failed to consider that his sparse treatment history was explained by his lack of insurance. As a preliminary point, plaintiff has not challenged the underlying premise—namely, that his treatment history was limited and routine. This was a prominent theme in the opinion. For example, the ALJ noted several times that plaintiff, although claiming to be totally disabled as of June 2007, nonetheless did not seek *any* treatment (not even a routine office visit apparently) for *four and a half years*. R. 15, 19. It is true that the ALJ cannot "rely on an uninsured claimant's sparse treatment history to show that a condition was not serious without exploring why the treatment history was thin." *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014). It is also true that the ALJ did not specifically discuss the question of insurance, although she did refer to plaintiff's other explanation that he "does not like doctors." R. 15. However, the Court agrees with the Government's argument that

7

any failure to explore the insurance issue is harmless error under the particular facts of this case. As the Government notes, plaintiff was able to obtain treatment at the Crusader Clinic a number of times, starting in 2012. Dkt. #19 at 7 (citing R. 286-310, 330-59). Moreover, plaintiff's lack of insurance, which he only mentioned briefly in his testimony, does not provide an explanation for many of the ALJ's points about his conservative treatment. For instance, no doctor ever recommended or referred plaintiff for physical therapy or cortisone injections for his joint problems. R. 19, 39-40. The ALJ also noted that plaintiff complained of knee pain in July 2012, but then did not seek additional treatment again until March 2013—over eight months later. *Id.* (citing R. 19, 341, 344). There is no suggestion that this gap in treatment was due to insurance problems, and plaintiff's decision to go to the doctor these two times (in addition to others) shows that he was able and willing to go to the doctor on some occasions. Moreover, the ALJ relied on plaintiff's failure to complain on those occasions when he did go to the doctor. For example, the ALJ stated the following about plaintiff's visit to the Crusader Clinic in March 2012: "The undersigned notes that the claimant did not complain of any hip, knee, or shoulder pain at this time." R. 20.

Third, plaintiff complains that the ALJ improperly relied on "one sentence in an ER visit report" stating that he was working at a barbeque restaurant and even may have had an ownership interest in the business. Dkt. #12 at 6-7. Plaintiff does not question that this fact, if true, would be relevant, but instead argues that the ALJ did not have "clear proof" it was true.

To understand this argument, it will be helpful first to set forth the ALJ's reasoning. The ALJ stated as follows:

> The record also contains questionable evidence regarding the claimant's work history. As is mentioned above, the claimant alleges that he stopped working in June 2007 due to his conditions (Exhibit 2E/2). However, a February 2012 treatment note reported that the claimant was working at Smokehouse Barbeque,

8

> which he allegedly owns and the treatment note indicated that the claimant "[was] working all of the time and always on the go" (Exhibit 5E). Although the claimant denied this work history on a number of occasions, the undersigned has afforded the treatment note with some weight, given the other factors surrounding the claimant's credibility (Exhibits 6E; 7E). Even if the claimant has not worked in any capacity since 2007, he testified that he has tried to find work and looked for various painting jobs since then. This indicates that the claimant himself believed he was able to work at greater than the sedentary exertional level during at least a portion of the alleged period of disability.

R. 19. In this passage, the ALJ referred to exhibits 5E, 6E, and 7E. These documents reveal that this issue first arose several months after plaintiff filed his original applications. On May 22, 2012, an Agency employee filed a "Request For Evidence Or Assistance," which stated the following:

> Please investigate possible work activity after AOD. Medical records obtained dated 2/27/12 report: "He works at the smokehouse Barbeque which he owns. He states he is working all of the time and always on the go".

Ex. 5E.[2] The Agency investigated by contacting plaintiff who, on June 5, 2012, completed a report entitled "Work Activity Report – Self Employment." Ex. 6E. On this report, plaintiff answered "no" to several questions about whether he had been self-employed or earned income after June 30, 2007.[3] The next day, an Agency employee followed up by calling plaintiff who "stated he had never been an owner, just an employee, and had no work activity since 06/2007."

---

[2] There is one factual question about this quotation that remains unclear, although neither side focused on it or argued that it is relevant to the present arguments. Based on the quotation marks inside the material quoted above, the Agency employee was apparently quoting from a February 27, 2012 medical report. One possible source for the quotation is a report prepared by Dr. Thomas Brefeld who treated plaintiff on that date, which was the first and only hospital visit. In the "Social History" section of this report, Dr. Brefeld noted that plaintiff stated that he "works at the Smoke House Barbecue, which he owns himself." R. 254. This matches up verbatim with the first half of the quote in the Agency employee's report. But Dr. Brefeld's report does not include, insofar as this Court can tell, the latter half of the quotation stating that plaintiff was "working all of the time and always on the go." It is possible that there is a separate source document containing this quotation, but the Court was unable to locate it.

[3] Although the evidence is inconclusive, plaintiff may have initially considered answering "yes" to some of these questions based on the fact that he handwrote answers to questions about "Date Work Started," "Date Work Ended," and "Average Number of Hours Worked," questions he would have only answered if he were self-employed. R. 200. Also, in response to a question asking about the "type of ownership arrangement," plaintiff handwrote an answer next to the word "Partnership" and also wrote an answer in the "Remarks" section at the end of the form. R. 200, 204. However, we do not know what he wrote because all the answers were scribbled over, perhaps indicating that he changed his mind about these answers.

9

Ex. 7E. At the administrative hearing, the ALJ specifically asked about this issue, the relevant testimony is as follows:

> Q	And I show no income for you since the year 2007.
>
> A	Right.
>
> Q	When you went to the emergency room in February, of 2012, five years later, you told that doctor that you were still working at the Smokehouse. And, in fact, you told that doctor you owned the Smokehouse. Is that correct?
>
> A	No. No. No.
>
> Q	Were you still working there in 2012?
>
> A	No. No.
>
> Q	Where would your doctor have—where would the emergency room doctor have gotten that if you hadn't [] said that?
>
> A	I don't know. Somebody else must have told her that or something. I don't know.
>
> Q	You have no ownership interest in the Smokehouse?
>
> A	No. None whatsoever.
>
> Q	Why did you stop working there in 2007?
>
> A	Because of my legs and everything. I couldn't—I couldn't stay on my legs too long. So I just quit. I got sick. I just quit.
>
> Q	And you haven't worked any job since then?
>
> A	No. I ain't been able to.

R. 36-37.

To summarize the evidence that was before the ALJ on this issue, on the one hand, there was a doctor's report stating that plaintiff had stated in February 2012 that he was then working at Smokehouse Barbeque and that he also had an ownership interest in the restaurant. Of course,

10

the doctor would have no reason to create this information and no basis for even obtaining this information, other than from plaintiff. On the other hand, there are plaintiff's repeated denials, both to Agency employees and to the ALJ at the hearing. In his briefs to this Court, plaintiff argues that the ALJ "presumed without clear proof" that plaintiff was working in 2012 at Smokehouse Barbeque and therefore only relied on a "hunch" in making this factual conclusion. Dkt. #12 at 7; Dkt. 20 at 1. Plaintiff's offers two arguments to support this conclusion. One is that "it seems far-fetched to think that Mr. Fort could have operated a sole proprietorship for presumably 5 years without reporting the income on his taxes." Dkt. #12 at 7. The other is that the ALJ noted that plaintiff had testified that during this five-year period he looked for other jobs, a fact that "would seem to undercut" the ALJ's conclusion. *Id.* These arguments, which plaintiff articulates tentatively (*e.g.,* the word "seem" is used twice), are not based on any concrete evidence and are themselves basically inferences (one might even say hunches) that this Court finds inconclusive based on its experience in adjudicating these cases. Additionally, contrary to plaintiff's assertion, it is not "far-fetched" to believe that individuals fail to pay income taxes for five years. *See, e.g., United States v. Churchill*, 04 CR 50022 (currently pending before this Court). The bottom line is that the ALJ was faced with a factual dispute and chose to credit one piece of evidence (the doctor's note) over plaintiff's contrary blanket denial (with no convincing explanation for the doctor's note). Plaintiff has not cited to any case or regulation suggesting this was an error or that the Court is permitted to second guess this type of decision.

Moreover, although plaintiff has complained about this alleged error along with the two others, these three alleged errors were only a part of the ALJ's overall reasoning. *See Halsell v. Astrue*, 357 Fed. Appx. 717, 722-23 (7th Cir. 2009) ("On balance, the flaws in the ALJ's

11

reasoning are not enough to undermine the ALJ's decision that Halsell was exaggerating her symptoms. Not all of the ALJ's reasons must be valid as long as *enough* of them are, [] and here the ALJ cited other sound reasons for disbelieving Halsell.") (emphasis in original). In his two briefs, plaintiff has not addressed these other reasons. As the Government notes, for example, the ALJ relied on Dr. Dow's un-contradicted expert opinion, and plaintiff has not offered any contrary medical opinion. The ALJ raised concerns about plaintiff's alleged use of a cane, stating the following: "The claimant testified that he has been using a non-prescription cane for the past five years but during the November 2012 consultative examination, he was specifically noted to have a normal, unassisted gait and the record indicates that he was not using a cane at the time." R. 19. Plaintiff has not challenged this finding. Another point the ALJ made is that plaintiff was confused about his hip pain. *See* R. 19 ("While x-rays from around that time revealed moderate degeneration of the left hip, the claimant was equivocal at the hearing, and testified that he has occasional *right* hip pain[.]") (emphasis in original).[4] Moreover, Dr. Ramchandani reported that plaintiff "denied having hip pain altogether." R. 19, 319. Again, plaintiff has not challenged these points. For all the above reasons, and based on the above facts in the record, the Court finds that the ALJ had substantial evidence for finding that plaintiff was not disabled any earlier than March 13, 2013.

\*   \*   \*

There is one final point that must be addressed. After completing its analysis, formulating its decision, and drafting this memorandum opinion and order, the following news article was provided to the undersigned: "My Last Bite: Ribs, sausage and sides a 10-year hit at

---

[4] In his post-hearing letter to the Appeals Council, plaintiff's counsel conceded that the ALJ was correct on this point, but argued that plaintiff was simply mistaken about where he was having pain. *See* R 250 ("Claimant mistakenly testified that his right his was painful. However, the records reflect that it is his left hip that causes him pain.").

Smokehouse." *See* http://www.rrstar.com/x987010718/My-Last-Bite-Ribs-sausage-and-sides-a-10-year-hit-at-Smokehouse (last visited November 28, 2016). Pertinent to this case, the article states the following about Gail Fort's brother, Stanley Fort:

> Prep work and service is done in the restaurant's kitchen, but the meat of the business is done over charcoal in a tin shack behind the restaurant where the truckers park. That's where Gail's brother, Stanley Fort, grills the pork ribs, pork shoulder and chicken before they're painted with a sauce inspired by Fort's kin from southwest Arkansas.
>
> \*   \*   \*
>
> In ads, the Smokehouse says "No Whimpy Polish Sausages Here," and Stanley agreed. The sausage was split, then deep fried, giving it a crispy burnt edge. It was topped with relish, jalapenos and opinions, and served with fries garnished with barbecue sauce.
>
> "It's not pansy at all," Stanley agreed.

*Id.*

Assuming that this Stanley Fort is the same Stanley Fort as in this case (and there are contextual factors suggesting it is, including the fact that plaintiff Stanley Fort worked at this same restaurant up until 2007), then this article raises numerous extremely serious questions. This Court is mindful of Judge Hamilton's excellent points raised in his dissent in *Rowe v. Gibson*, 798 F.3d 622, 636-644 (7th Cir. 2015). Accordingly, rather than making independent factual finding *sua sponte* on appeal, this Court will hold a status hearing on December 9, 2016 at 9:00 a.m. to address how the Court should address information outside the administrative record that has come to light.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is denied, the government's motion is granted, and the case is set for status on December 12, 2016 at 9:00 a.m. ***All*** counsel of

record must be physically present and prepared to discuss the issues concerning the information provided in the newspaper article.

Date: November 28, 2016	By: _____
　　　　　　　　　　　　　　　　　　　Iain D. Johnston
　　　　　　　　　　　　　　　　　　　United States Magistrate Judge